MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:     2015 ME 120
Docket:       Lin-14-296
Argued:       February 12, 2015
Decided:      September 1, 2015

Panel:        SAUFLEY, C.J., and ALEXANDER, <u>MEAD</u>, GORMAN, and JABAR, JJ.

## SALLY C. PEW et al.

v.

## ROBERT N. SAYLER et al.

MEAD, J.

[¶1]   Plaintiffs Sally C. Pew[1] and the Trustees of the John P. Cooke Disclaimer Trust (Cooke) own most of Mouse Island in the Town of Southport in common with defendants Robert and Martha Sayler, John and Marcia Hincks, and Peter and Maria Nickles (collectively, the Other Owners).

[¶2]   Pew and Cooke appeal from a summary judgment entered by the Superior Court (Lincoln County, *Hjelm, J.*) in favor of the Other Owners on Pew and Cooke's complaint for equitable partition, and from the court's post-trial judgment on the Other Owners' counterclaim awarding them damages for nonpayment of commonly-shared expenses.  Pew and Cooke contend that the court erred in determining that (1) a right of first refusal (ROFR) in the parties' deeds and contractual agreements constituted a waiver of their right to partition, (2) the

---

   [1]  Pew's husband, George Pew, was a plaintiff in this case but died prior to the entry of judgment by the Superior Court.

2

right of first refusal did not violate the rule against perpetuities, (3) the parties' agreements required the employment of a full-time caretaker on the island absent a two-thirds vote to the contrary, and (4) Pew and Cooke were liable for certain commonly-shared expenses that they had not paid.

[¶3] We conclude that the rights of first refusal in the parties' deeds violate the rule against perpetuities and are therefore void as a matter of law. The rights of first refusal in the parties' separate contractual agreements with one another, however, are valid vis-à-vis each other and constitute an effective waiver of these parties' rights to equitable partition. On that basis, and because we conclude that the court did not err in apportioning expenses, we affirm the judgment.

## I. BACKGROUND

### A. The Land at Issue

[¶4] The historical facts are not disputed. Excepting three houses and the land underlying them that they own individually, the parties jointly own Mouse Island. The three separately-owned houses are referred to as Mousetrap, which is owned by Sally Pew; Brown House, in which the Nickleses and the Saylers each own a one-half undivided interest; and Gray House, in which the Hinckses and Cooke each own a one-half undivided interest. Pew owns a one-third undivided interest in the island's common property; the Nickleses, Saylers, Hinckses, and Cooke each own a one-sixth undivided interest.

B.      Relevant Agreements

[¶5]  Several agreements entered into by the parties or their predecessors in title are relevant to our analysis.

1.      August 21, 1978, Letter of Agreement

[¶6]  A letter setting out the basic terms of the purchase of Mouse Island, signed by these parties or their predecessors, contained the following provisions:

> [Nickles, Pew, and Sayler] understand[] that the caretaker is receiving $700 a month plus payment for utilities.  [They] agree[] that the caretaker should continue in his position and receive the same monthly payments.
>
> All the parties are agreed that any proposal for future development on the Island would require the written, unanimous concurrence of all owners of the Island.  Further, it is agreed that, if any owners wish to dispose of any or all of his or her interest, that interest will first be offered to the Other Owners to provide them with the opportunity first to purchase the interest.
>
> It is agreed that an association of owners will be created to collect assessments from the owners for payment of the caretaker's salary, real estate taxes, and general maintenance.  These assessments will be divided equally among the three principal houses . . . . Each of the parties understands that in situations where the caretaker must call in outside assistance to work on a project affecting only a particular house, the owner of that house will pay for the outside assistance.  Work done by the caretaker on common Island property, such as the sea wall, studio, tennis courts, etc., will be shared by all owners.  Further, it is understood that the caretaker's work on each of the homes on the Island will not change the basi[c] intention of the parties to share equally the caretaker's salary and benefits.

4

## 2. December 26, 1978, Purchase and Sale Agreement

[¶7] A formal purchase and sale agreement executed by the parties or their predecessors contained two relevant provisions: (1) a requirement that a right of first refusal be included in the deeds, and (2) an agreement that the owners of Mouse Island would create an association within 120 days "for the purpose of maintaining all the facilities, buildings and improvements on or related to Mouse Island excepting [the three separately-owned houses] . . . and generally governing the management of the Island."

## 3. The Deeds

[¶8] As provided in the purchase and sale agreement, the deeds leading to the current ownership situation on Mouse Island each contained the following clause:

> In the event that the grantee desires to sell the real estate herein conveyed, the grantee shall prior to the acceptance of any offer received by him/her make a similar offer excepting only as to the time set for acceptance to his/her dwelling co-tenant of record and to his/her co-tenants in Mouse Island. His/her dwelling co-tenant shall have 30 days in which to accept the grantee's offer. If his/her dwelling co-tenant accepts the offer, all other offers made by the grantee shall automatically be terminated. If his/her dwelling co-tenant does not accept the offer within said 30-day period, the Island co-tenants shall have 15 days in which to accept the grantee's offer. In the event that two or more Island co-tenants attempt to accept the offer after the dwelling co-tenant's time for acceptance has terminated, the first acceptance from an Island co-tenant received by the grantee shall be binding and other attempted acceptances after said

receipt shall be void. Closing shall be within 90 days of the acceptance of the grantee's offer . . . .

[¶9]  The deed from John P. Cooke to his successors, the Cooke Trustees, inadvertently omitted the clause; in entering a partial summary judgment in this case the Superior Court, without objection, reformed the Cooke Trustees' deed to include the clause.

4.     The Agreement of Principles

[¶10]  Subsequent to the execution of the deeds, Pew, Nickles, Sayler, and the predecessors of Hincks and Cooke signed an "Agreement of Principles for Mouse Island" (AOP).  The court found that

> [t]he original owners, including the Pews, the Saylers and the Nickleses, entered into [the AOP]. . . . They executed the document proximate in time to when they bought the island.  Although Cooke and the Hinckses acquired their ownership interest after the original owners signed the AOP, they considered themselves to be bound by it. The court therefore treats all of the present owners as parties to the agreement.

Although the Cooke Trustees challenge the court's construction of the AOP, they do not contest its finding that they are bound by it.

[¶11]  The AOP created six voting shares, two for each of the three houses. As a result, Pew has two voting shares and Cooke and the Other Owners each have one.  The AOP states, in relevant part:

> The undersigned, who are the owners of Mouse Island, express their intention that the Island be maintained essentially as it is today and

that the working island atmosphere be maintained and enhanced. . . . The parties also take this occasion to reaffirm the covenants in their deeds respecting the right of first refusal accorded individual property co-tenants or Island co-tenants.

. . . .

The parties agree that any significant changes affecting the Island require a two-thirds vote of the parties, i.e., four shares. Similarly, any change in the principles established by this Agreement shall be by two-thirds vote of the parties.

C.    Procedural History

1.    Complaint

[¶12]  In July 2011, Pew filed a complaint in the Superior Court naming the Other Owners as defendants, and Cooke as a party-in-interest. The complaint alleged, and the Other Owners admitted, that the parties had managed Mouse Island by consensus for over thirty years and had employed a year-round caretaker during that time. The current salaried caretaker lives on the island with his wife. In 2010 the Other Owners unilaterally raised the caretaker's annual salary by $6,000, an increase that Pew and Cooke refused to pay. Because of her concerns regarding the caretaker's role, cost, and performance, Pew notified the Other Owners that she would stop contributing to the caretaker's salary altogether as of October 15, 2010, although Pew and Cooke maintain that they paid their share of other common expenses.

[¶13] The complaint asked the court to partition the island into two lots, one being a lot solely-owned by Pew, and to declare that all prior agreements among the parties were null and void, including any obligation Pew had to contribute to the caretaker's salary after October 2010.

2. Counterclaims and Cross-Claim

[¶14] The Other Owners counterclaimed against Pew and Cooke, asking the court to declare, inter alia, that (1) the right of first refusal contained in the deeds waived the owners' partition rights, (2) Pew had breached the AOP by seeking partition without complying with the right of first refusal, and (3) Pew and Cooke had breached the AOP by refusing to pay their share of the caretaker's salary without first obtaining a two-thirds majority to terminate him in accordance with the AOP.

[¶15] Cooke joined Pew's action to partition Mouse Island and cross-claimed against the Other Owners, asking the court to (1) partition Gray House by ordering that, through a bidding process, either Cooke buy out the Hinckses' interest or they buy out Cooke's interest; (2) further partition the island if Cooke bought out the Hinckses' interest and Pew's request for partition was granted, resulting in three lots: one owned by Pew, one owned by Cooke, and the remaining lot owned by the Nickleses and Saylers; and (3) declare prior agreements null and void.

[¶16]    The Other Owners moved to dismiss the cross-claim and counterclaimed against Cooke, alleging unjust enrichment arising from Cooke's continued receipt of the benefit of the caretaker's services without paying for that benefit.

3.    Summary Judgment

[¶17]  All parties moved for summary judgment.  *See* M.R. Civ. P. 56.  The court denied the motions and also denied the Saylers' motion to dismiss Cooke's cross-claim.  It concluded that

> under the better view of the law, as a general matter, when a co-tenant gives a right of first refusal to other co-tenants, the former impliedly waives her right to obtain the physical partition of the island that would be based on a divided fractional ownership interest, at least until the selling co-tenant receives a bona fide offer from a third-party to acquire that interest.

However, because the Cooke deed did not contain the right of first refusal clause found in the Other Owners' deeds, the court determined that an issue of material fact existed that precluded summary judgment.

[¶18]  In December 2012, the Other Owners filed a supplemental motion for summary judgment, asserting that the omission of the right of first refusal from Cooke's deed was inadvertent, and that the deed should be reformed.  Pew and Cooke did not contest that assertion, and the court reformed the Cooke deed.  As a result, the issue of fact precluding summary judgment was resolved, and the court

entered a summary judgment for the Other Owners on those counts of the complaint and counterclaim concerning partition, declaring: "The mutual rights of first refusal set out in the deeds of the parties result in a waiver of the right to partition of the Mouse Island property." Because the claims against Pew and Cooke for breach of the AOP and unjust enrichment remained pending, the court declined to enter its decision as a partial final judgment pursuant to M.R. Civ. P. 54(b)(1).

4.    Trial

[¶19]  The court held a bench trial concerning the remaining claims and found that "the instruments defining the parties' ownership obligations require them to pay for a resident caretaker," a requirement that could only be altered by a two-thirds vote pursuant to the AOP. As a result, the court concluded that "all of the owners are jointly liable for the expenses arising from [the caretaker's] role as island caretaker. This means that Pew and Cooke are liable for their share of that expense." It then parsed out expenses that the Other Owners claimed were joint obligations, allowing some and disallowing others. The court entered a final judgment incorporating its prior decisions and awarded the Other Owners $67,110.63 plus interest and costs from Pew, and $16,779.45 plus interest and costs from Cooke.

[¶20]  This appeal followed.

10

## II. DISCUSSION

### A. Right of First Refusal: Deeds

[¶21] Pew and Cooke assert that the right of first refusal (ROFR) in their deeds is void because it violates the rule against perpetuities. We agree. "Maine follows the traditional common law rule against perpetuities that, 'no interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest.'"[2] *White v. Fleet Bank of Me.*, 1999 ME 148, ¶ 10, 739 A.2d 373 (citation omitted). In *Low v. Spellman*, we held that the rule applies to rights of first refusal, at least those that last perpetually.[3] 629 A.2d 57, 58 (Me. 1993).

---

[2] The common law rule is modified by Maine's "wait and see" statute, 33 M.R.S. § 101 (2014), which provides:

> In applying the rule against perpetuities to an interest in real or personal property limited to take effect at or after the termination of one or more life estates in, or lives of, persons in being when the period of said rule commences to run, the validity of the interest shall be determined on the basis of facts existing at the termination of such one or more life estates or lives. In this section an interest which must terminate not later than the death of one or more persons is a "life estate" even though it may terminate at an earlier time.

*See White v. Fleet Bank of Me.*, 1999 ME 148, ¶ 11, 739 A.2d 373. The statute is not applicable in this case because the ROFR in the parties' deeds is not in any way related to "life estates in, or lives of, persons in being," 33 M.R.S. § 101 (2014); rather, as discussed *infra*, it runs with the land. *See White*, 1999 ME 148, ¶ 23, 739 A.2d 373 ("Maine's 'wait and see' statute is in derogation of the common law, and as such, must be narrowly construed.").

[3] Our opinion in *Low* suggested that rights of first refusal that do not "endure[] forever" and do not mandate a fixed sale price might not violate the rule against perpetuities. *See Low v. Spellman*, 629 A.2d 57, 58 (Me. 1993). Because we conclude that the ROFR at issue in this case is perpetual, we need not decide whether the rule applies to all such preemptive rights.

[¶22] The ROFR in the Pew and Cooke deeds is perpetual. In contrast to *Tarason v. Wesson Realty, LLC*, where a deed's use of the term "*this* Grantee" led us to conclude that a conveyed easement was personal, and not an easement appurtenant, 2012 ME 47, ¶¶ 19-20, 40 A.3d 1005, the ROFR clauses in the Pew and Cooke deeds refer to "the Grantee." In combination with the deeds' conveyance to Pew, Cooke, and their "heirs and assigns," that language suggests that the ROFR was intended to remain applicable in succeeding conveyances.

[¶23] Furthermore, in 2013 the Legislature amended the governing statute to make clear its preference for the conveyance of fee simple, as opposed to personal, interests. P.L. 2013, ch. 90, § 1 (effective Oct. 9, 2013) (codified at 33 M.R.S. § 772(1) (2014)). As amended, the statute provides:

> In a conveyance or reservation of real estate, the terms "heirs," "successors," "assigns," "forever" or other technical words of inheritance, or an habendum clause, are not necessary to convey or reserve an estate in fee. A conveyance or reservation of real estate, whether made before or after the effective date of this section, must be construed to convey or reserve an estate in fee simple, unless a different intention is clearly expressed in the instrument by a statement that the interest conveyed or reserved is an interest other than an estate in fee, *by a limiting of the duration of the interest to a period less than perpetual duration or by an explicit restriction of the interest to the use and benefit only of the person or persons to whom it is conveyed or reserved*. The omission of technical words of inheritance may not be construed to evidence an intention to convey or reserve an interest other than an estate in fee simple, even if such words are used elsewhere in the same instrument.

12

33 M.R.S. § 772(1) (emphasis added). Nothing in the ROFR at issue limits its duration or explicitly restricts it to the original grantees. Accordingly, the statute requires us to construe the ROFR as running with the land, not as a restriction on alienation personal to the original grantees.

[¶24] Having reached this point in the analysis, we apply the rule against perpetuities and conclude that the ROFR does not comply because, as we determined in *Low*, 629 A.2d at 58-59, it is an interest in land that will not necessarily be exercised ("vest") within a life in being plus twenty-one years. Because its exercise is unrelated to any person's lifetime, the ROFR could theoretically languish for decades or longer before being triggered by Pew's heirs or the Cooke Trust deciding to sell their interests in Mouse Island. For that reason, the ROFR in the Pew and Cooke deeds is void. *See id.* at 59 (holding that a right of first refusal violated the rule against perpetuities because it "is clear on its face that it is intended to apply not only to the original parties to the contract, but also to all of their heirs and assigns").

B.     Right of First Refusal: Contract

[¶25] Concerning these parties, however, the ROFR is separately binding as a matter of contract law.[4] No party contests the applicability of the AOP contract,

---

[4] The perpetuities problem just discussed is not presented in an analysis of the parties' contractual agreements. As stated by one learned treatise,

in which each of them "reaffirm[ed] the covenants in their deeds respecting the right of first refusal accorded individual property co-tenants or Island co-tenants." Pew was a signatory to the AOP, and the Cooke Trustees, although not signatories, do not contest the trial court's factual finding that they intended to be bound by it. Demonstrating that intent, Cooke voiced no objection when the trial court inserted the ROFR covenant referenced by the AOP into the Cooke deed. It is clear that until the present dispute arose, these parties and their predecessors intended to be bound by the contractual provisions of the AOP, including its incorporation of the explicit language of the ROFR. *See Barr v. Dyke*, 2012 ME 108, ¶ 13, 49 A.3d 1280.

[¶26] In addition to the AOP, Pew, as an original owner, was also a party to the Letter of Agreement, specifying that "it is agreed that, if any owners wish to dispose of [their] interest, that interest will first be offered to the Other Owners to provide them with the opportunity first to purchase the interest"; the Purchase and Sale Agreement, signed by the original buyers, in which the seller agreed to insert

---

[c]ontracts are normally excluded from the necessity of complying with the rule against perpetuities. From a remoteness viewpoint, transactions purely contractual do not involve future interests in specific property; hence there can be no problem at all of remote vesting. From a more realistic viewpoint, no fettering of specific property can be created by a transaction exclusively contractual in character, such as a right of first refusal.

10 Richard R. Powell & Michael Allan Wolf, *Powell on Real Property* § 72.07 (2015).

14

in each of the buyer's deeds, including Pew's, the ROFR that now appears there; and the conveyance to Pew of the deed containing the ROFR.

C.     Waiver of Right to Partition

[¶27]  Having concluded that Pew and Cooke are bound by the ROFR as a matter of contract law, we turn to the question of whether that preemptive right acts as a waiver of their right to partition.  The trial court granted the Other Owners summary judgment after concluding that Pew and Cooke had, through their acceptance of a ROFR, implicitly waived their right to an equitable partition of the parties' undivided interests in Mouse Island.  We review the entry of a summary judgment de novo.  *Remmel v. City of Portland*, 2014 ME 114, ¶ 11, 102 A.3d 1168.  Partition of jointly-held property is a flexible procedure available through the equity jurisdiction of the Superior Court.  14 M.R.S. § 6051(7) (2014); *Murphy v. Daley*, 582 A.2d 1212, 1213 (Me. 1990).  "The trial court's equity power is broad and flexible, and is reviewed on appeal for an abuse of discretion." *Withee v. Garnett*, 1998 ME 30, ¶ 4, 705 A.2d 1119.

[¶28]  In general, tenants in common have a right to have their undivided interest in land partitioned.  *Wood v. Little*, 35 Me. 107, 110-11 (1853). Nonetheless, in *Matthews v. Matthews*, a case in which the plaintiff agreed to allow his ex-wife to live in the jointly-owned marital home for "as long as [she] desire[s]," we implicitly recognized that a co-tenant may voluntarily limit or waive

his or her right to partition. 2008 ME 66, ¶¶ 2, 5, 945 A.2d 1230. Notwithstanding the unequivocal declaration of the right to partition in *Wood*,[5] we affirmed the Superior Court's finding that "[the plaintiff] cannot partition the property . . . unless or until [his ex-wife] chooses to sell the property or buy him out." *Id.* ¶¶ 4, 6.

[¶29] Consistent with *Matthews*, the Restatement (Second) of Property states a black-letter rule: "A restraint on the power of a co-tenant to compel partition, created to last for a reasonable time only, is valid."[6] Restatement (Second) of Prop.: Donative Transfers § 4.5 (Am. Law Inst. 1983).[7] The reporter's note explains that

> [a]greements among co-tenants that each shall have rights of first refusal should the other desire to sell his interest have been construed as implying enforceable covenants not to sue for partition. Such options, like other contract rights, are usually personal to the optionee and may not be binding upon his successors in interest.

*Id.* § 4.5 reporter's note 2(c)(3). Such is the case here, where we have determined that the ROFR is binding only on those parties who specifically agreed to it, and

---

[5] "The law gives tenants in common an absolute right to have their lands divided." *Wood v. Little*, 35 Me. 107, 111 (1853).

[6] *Powell on Real Property* reports that restraints on the right to partition have been found reasonable in several states if the restriction is time limited in some manner. 10 Richard R. Powell & Michael Allan Wolf, *Powell on Real Property* § 77.08 (2015). *Powell* goes on to say that "[a]ny attempted restraint on partition that lacks a time restriction is likely to be found invalid." *Id.* The time restriction in this case is metabolic—the lifetimes of the owners who agreed to the AOP, assuming they do not sell their interest.

[7] The Restatement (Third) of Property did not supersede this provision of the Restatement (Second). Restatement (Third) of Prop: Wills and Other Donative Transfers, vol. 3, app. (Am. Law Inst. 2011).

not on those who may in the future take an interest in Mouse Island by deed transfer without accepting separate contractual restrictions.

[¶30] Accordingly, the ROFR, binding on Pew and Cooke, acts to waive their right to partition if that was an intended effect of their agreement with the Other Owners. We conclude that it was an intended effect because the ROFR would necessarily be extinguished by the partition that Pew and Cooke seek; in that event no holder of the ROFR could purchase Pew or Cooke's *undivided* interest, which is the opportunity that the ROFR guarantees the Other Owners, because Pew and Cooke's formerly undivided interest would have then been partitioned into solely-owned parcels, and so their undivided interests would no longer exist.

[¶31] Furthermore, as the trial court noted, even if a partitioned solely owned interest were offered first to the Other Owners, they would no longer have the opportunity to purchase it at the market rate for an *undivided, commonly held* interest—the specific opportunity that the ROFR establishes. A partition would result in a parcel solely owned by Pew, and possibly another solely owned by Cooke. The court observed that

> Pew argues expressly that she seeks partition in part to enhance the market value of her interest, contending that it will be more difficult to sell an undivided fractional interest in land that is also owned commonly by others, as compared to selling a parcel free and clear of someone else's ownership claim, and that the value of a separate

> parcel is greater than a[n] ownership position held jointly with others. Consequently . . . if Pew were prepared to sell that partitioned property to a third-party, the non-selling tenants would end up paying a higher price to exercise their right of first refusal than they would under the present ownership arrangement. But they would end up with the same interest that they would have acquired in the absence of partition.

The same rationale applies to Cooke's request for a solely owned parcel. Pew and Cooke themselves asserted in their statement of facts that "[i]n the opinion of the Pews and [] Cooke as owners of Mouse Island, the right of first refusal and ownership scheme significantly devalue their ownership interests."

[¶32] Finally, as further evidence that the ROFR was part of a plan designed to maintain the status quo on Mouse Island, the AOP affirmed the owners' "intention that the Island be maintained essentially as it is today," and it instituted a system requiring a two-thirds majority vote in order to make any significant change to the way of life that the parties were purchasing an interest in. If Pew and Cooke were allowed to partition the island into separately-owned lots, the Other Owners would no longer be guaranteed the right to enjoy the entirety of the island at will as they have for more than thirty years because Pew and Cooke could restrict access to their separately-owned lots. We conclude that the ROFR is part of a contractual mechanism specific to the signatories of the original agreement and, by their implicit acceptance, the Hinckses and the Cooke Trustees, intended to prevent such a significant limitation on their use of the common areas of the island.

18

[¶33] For these reasons, we hold that by accepting the ROFR, Pew and Cooke waived their right to partition.[8] The contractual limitation on their ability to sell their interests in their property to third parties established by the ROFR, and the waiver of equitable partition associated with that contractual limitation, produce a simple result: each of these parties is, pursuant to the AOP, bound to offer to sell his or her interest in his or her property to the others before conveying to third parties at the same sale price. If property is ultimately conveyed to a third party after (1) an opportunity to purchase at the same price is declined by the Other Owners, (2) the property is inherited as the result of the death of a party bound by the AOP, (3) the ROFR is extinguished by a two-thirds vote of the parties according to the AOP, or (4) ownership has otherwise changed according to law, the subsequent owner is not bound by the ROFR established in the AOP.[9]

D.    The Caretaker

[¶34] Pew and Cooke contend that the AOP does not require that the owners employ a caretaker in general, or the current caretaker in particular. We review the

---

[8]    Other courts have recognized that by executing a ROFR, co-tenants may waive their right to partition.    *See Libeau v. Fox*, 892 A.2d 1068, 1071 (Del. 2006); *LEG Invs. v. Boxler*, 107 Cal. Rptr. 3d 519, 525 (Cal. Ct. App. 2010).

[9]  A new owner of an undivided interest may wish to join the mutual covenants established in the AOP that the original owners exchanged in order to maintain the island's exclusive circle of ownership. Concerning the parties to this action, the Superior Court expressly found that "[a]lthough [Torrey] Cooke [as trustee] and the Hinckses acquired their ownership interest after the original owners signed the AOP, they considered themselves to be bound by it.  The court therefore treats all of the present owners as parties to the agreement."  Cooke does not challenge this finding on appeal.

interpretation of a contract and the question of whether it is ambiguous de novo. *Flaherty v. Muther*, 2013 ME 39, ¶ 17, 65 A.3d 1209. If the contract is ambiguous, "its interpretation is a question of fact for the factfinder." *Id.* (quotation marks omitted). The question of whether a breach of the AOP occurred is also a finding of fact reviewed for clear error. *Coastal Ventures v. Alsham Plaza, LLC*, 2010 ME 63, ¶ 20, 1 A.3d 416.

[¶35] The trial court did not err in concluding that the AOP is ambiguous concerning the question of whether it requires the employment of a full-time caretaker. In the AOP, the owners agreed that their intent was "that the Island be maintained essentially as it is today"; to that end, they agreed that penalties would be imposed on any owner who "fail[ed] to pay his/her appropriate share of expenses." The AOP does not, however, specify the expenses that are "appropriate." For that reason the court appropriately looked to extrinsic evidence of the parties' intent, *see id.* ¶ 27, in this case the August 21, 1978, letter of agreement that it determined was the foundation for the later AOP.

[¶36] The letter states, in part:

[Nickles, Pew, and Sayler] understand[] that the caretaker is receiving $700 a month plus payment for utilities. [They] agree[] that the caretaker should continue in his position and receive the same monthly payments.

. . . .

> It is agreed that an association of owners will be created to collect assessments from the owners for payment of the caretaker's salary, real estate taxes, and general maintenance. These assessments will be divided equally among the three principal houses . . . . Each of the parties understands that in situations where the caretaker must call in outside assistance to work on a project affecting only a particular house, the owner of that house will pay for the outside assistance. Work done by the caretaker on common Island property, such as the sea wall, studio, tennis courts, etc., will be shared by all owners. Further, it is understood that the caretaker's work on each of the homes on the Island will not change *the basi[c] intention of the parties to share equally the caretaker's salary and benefits*.

(Emphasis added.)

[¶37] The letter makes clear that the cost of a caretaker was an accepted expense to be commonly shared. As further support, the court found that the owners had employed a full-time caretaker for over thirty years, including the current caretaker for more than ten years, and had, by each paying their full share of the cost until 2010, recognized the caretaker position to be a necessary expense. As late as 2009, Pew and Cooke agreed to give the current caretaker a $3,000 raise. For these reasons, the court did not err in finding that "all of the owners are jointly liable for the expenses arising from [the caretaker]."

[¶38] Moreover, the court did not err in finding that the AOP prevented Pew and Cooke from unilaterally changing the caretaking arrangement—i.e., by firing the caretaker—by withholding their share of that cost. The court found that any such change would constitute a significant change affecting the island pursuant to

the AOP, and thus required a two-thirds vote before it could be implemented. Given the parties' long-standing agreements and decades-long course of dealing, the court's conclusion is well supported.

[¶39] Pew and Cooke also assert that they have a common law right to discharge an at-will employee, and that the caretaker is employed pursuant to a contract of indefinite duration that is terminable at will. *See Burnell v. Town of Kingfield*, 686 A.2d 1072, 1073 (Me. 1996) ("It is well settled that a contract of employment for an indefinite length of time is terminable at will by either party." (quotation marks omitted)). The flaw in their argument lies in the answer to the question of who can exercise that right. Pursuant to the AOP, the owners *collectively* can, by two-thirds vote, fire the caretaker at will. Pew and Cooke cannot do so as individual owners in a manner inconsistent with the AOP.

E.    Other Commonly-Shared Expenses

[¶40] Pew and Cooke finally argue that the court erred in finding them liable for a share of certain island expenses after trial. "An award of damages will not be disturbed unless there is no basis in the record to support it." *Jenkins, Inc. v. Walsh Bros., Inc.*, 2001 ME 98, ¶ 18, 776 A.2d 1229 (quotation marks omitted). Pew and Cooke do not challenge the court's calculation of amounts expended, only its classification of some expenses as commonly-shared.

22

[¶41]  The court painstakingly parsed the expenses claimed by the Other Owners, finding some to be allowable commonly-shared expenses, while disallowing others.  It carefully distinguished between the two categories by examining the AOP; the August 21, 1978, letter of agreement; and the owners' common practice through the years.  Because there is a basis in the record to support the court's approach, we will not disturb its damages award.  *See id.*

The entry is:

Judgment affirmed.

---

**On the briefs:**

James T. Kilbreth, Esq., and Adrianne E. Fouts, Esq., Drummond Woodsum, Portland, for appellants Sally C. Pew and the Trustees of the John P. Cooke Disclaimer Trust

Deborah M. Mann, Esq., and Tudor N. Goldsmith, Esq., Jensen Baird Gardner & Henry, Portland, for appellees Robert and Martha Sayler, John and Marcia Hincks, and Peter and Maria Nickles

**At oral argument:**

James T. Kilbreth, Esq., for appellants Sally C. Pew and the Trustees of the John P. Cooke Disclaimer Trust

Deborah M. Mann, Esq., for appellees Robert and Martha Sayler, John and Marcia Hincks, and Peter and Maria Nickles

Lincoln County Superior Court docket number CV-2011-31